UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNY WONG and
MICHAEL CHUNG

      Plaintiffs,                             Case No. 14-cv-13798
                                                 Hon. Matthew F. Leitman

v.

DETROIT ENTERTAINMENT,
LLC *et al.*

      Defendants.
_____/

## ORDER GRANTING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT (ECF ## 73, 76, 77)

Plaintiff Jenny Wong ("Wong") is a former poker dealer at the Motor City Casino (the "Casino") in Detroit, Michigan. In June 2014, she was arrested for allegedly stealing a $100 poker chip from the Casino. Wong contends that immediately after her arrest, Defendant Preston McBride ("McBride"), an employee of the Michigan Gaming Control Board (the "Gaming Board"), coerced and deceived her into surrendering her gaming license. Wong insists that the remaining Defendants (the Casino, one of its employees, and the two police officers who arrested her) worked in concert with McBride to deprive her of her license. In this action, Wong and her husband bring several claims against the Defendants. (*See* Compl., ECF #1; Sec. Am. Compl., ECF #55.) The Defendants have moved for

summary judgment (the "Motions"). (*See* ECF ## 73, 76, 77.)  For the reasons stated below, the Motions are **GRANTED.**

<b>I</b>

In 1999, the Casino hired Wong as a poker dealer. (*See* Wong Dep. at 13, ECF #76-2 at Pg. ID 1397.)  As a condition of her employment, the Casino required Wong to obtain and maintain an occupational gaming license issued pursuant to the Michigan Gaming Control and Revenue Act, M.C.L. § 432.201 *et seq.* (the "Gaming Act"), and it assisted her in obtaining that license.  (*See id.* at 14-15, ECF #76-2 at Pg. ID 1398-99.)  When Wong obtained her license, she received a badge that was the physical manifestation of her license. (*See* ECF #81-3 at Pg. ID 2205.)  Wong worked for the Casino for nearly fifteen years. (*See* Wong Dep. at 13, ECF #76-2 at Pg. ID 1397.)

On May 13, 2014, the Casino determined that a table in its poker room was short $100.  Wong had worked at the table in question that day. (*See* Ramon Bosques ("Bosques") Dep. at 8-9, ECF #73-4 at Pg. ID 737.)

The Casino reported the $100 shortage to the Gaming Board and began investigating the shortfall. (*See* 5/14/2014 Incident Report, ECF #86-2 at Pg. ID 2298; *see also* Bosques Dep. at 8-9, ECF #73-4 at Pg. ID 737.)  The Casino's investigation took two weeks. (*See* Bosques Dep. at 10-11, ECF #73-4 at Pg. ID 738.)

As part of the investigation, the Casino's surveillance team reviewed video footage of the poker table, including footage of Wong's shift. (*See id.* at 8-9, ECF #73-4 at Pg. ID 737.)   The team also reviewed footage of Wong's "prior work schedule" for at least the previous two weeks. (*Id.* at 10-11, ECF #73-4 at Pg. ID 738.) After the Casino completed its investigation, it concluded that Wong stole the missing $100 poker chip. (*See id.* at 9, ECF #73-4 at Pg. ID 737.)  On May 31, the Casino informed the Gaming Board that Wong "was observed placing a $100 [chip] under her sleeve on 5/13/2014." (5/31/2014 Incident Report, ECF #86-2 at Pg. ID 2299).

The following day, Michigan State Police ("MSP") officers John Keating ("Keating") and Andrew Hlinka ("Hlinka") reviewed video of Wong's May 13th shift at the poker table. (*See* Keating Dep. at 18, ECF #73-7 at Pg. ID 807; *see also* Hlinka Dep. at 8-9, ECF #73-8 at Pg. ID 833.)   Keating concluded that the video depicted Wong "reach[ing] into the rack of chips and … [then] put[ting] something up her sleeve." (Keating Dep. at 18, ECF #73-7 at Pg. ID 807.)  Hlinka likewise determined that the video showed Wong's "right hand" manipulating the $100 casino chip immediately before that same hand appeared to go "up into her sleeve." (Hlinka Dep. at 42, ECF #73-8 at Pg. ID 842.)  Both officers concluded that based on their review of the video, there was "probable cause" to believe that Wong stole the missing $100 chip. (Keating Dep. at 18-19, ECF #73-7 at Pg. ID 807; *see also*

Hlinka Dep. at 11-12, ECF #73-8 at Pg. ID 834.)  The officers then contacted the Casino and asked that Wong "be brought" to their office[1] so that they could speak with her. (Keating Dep. at 20-21, ECF #73-7 at Pg. ID 807.)

Casino Shift Manager Michelle Thomas ("Thomas") "took [Wong] to the [MSP's office]." (Thomas Dep. at 13, ECF #73-9 at Pg. ID 856.)  Thomas did not participate in officers' interview of Wong. (*See id.* at 22-23, ECF #73-9 at Pg. ID 859.)  Her only interaction with the officers was to inform them that Wong spoke English.  (*See* Wong Dep. at 30-31, ECF #76-2 at Pg. ID 1414-15.)  Thomas then left the MSP's office and did not return until after the interview was over. (*See* Thomas Dep. at 43-44, ECF #73-9 at Pg. ID 864.)

Wong says that once the interview began, Keating and Hlinka accused her of stealing the $100 chip, refused to allow her to see her union representative or make a phone call, and threatened to take her to jail. (*See* Wong Dep. at 31-33, ECF #76-2 at Pg. ID 1415-17.)  Wong insists that she repeatedly told Keating and Hlinka that she did not steal the chip. (*See id.*)  Despite those denials, Keating and Hlinka arrested Wong for committing the state-law crime of "larceny in a building." (*See* Keating Dep. at 24, ECF #73-7 at Pg. ID 808.)  They then photographed, fingerprinted, and released her from their custody. (*See id.*)

---

[1] The MSP's office is located on the third floor of the Casino within a larger space that belongs to the Gaming Board. (*See* Keating Dep. at 8-9, ECF #73-7 at Pg. ID 804.)

Wong was then confronted by McBride in the Gaming Board's offices. (*See* Wong Dep. at 35-36, ECF #76-2 at Pg. ID 1419-20.)  Wong says that McBride was "really loud" and demanded that she surrender her badge. (*Id.* at 35, ECF #76-2 at Pg. ID 1419.)  Wong refused and asked to see her union representative. (*See id.*)  Wong maintains that McBride "kept on talking," again demanded her badge, and that his behavior confused and frightened her. (*Id.* at 36, ECF #76-2 at Pg. ID 1420.)  Wong says that she "was really scared and arguing with him for probably about 10 minutes." (*Id.*)  During their argument, Wong took out her badge and held it in her hand. (*See id.*)  McBride physically "grabbed it from [her]" and did not return it. (*Id.*)  McBride "then pointed to a piece of paper[]" and demanded that Wong sign it. (*Id.*)

The "piece of paper" was the second page of a two-page document titled "Voluntary Surrender and Termination of Occupational License" (the "Voluntary Surrender Form") (*See* ECF #73-14 at 2-3, Pg. ID 927-28.).  Wong says that McBride never showed her the first page of that document. (*See* Wong Dep. at 38, ECF #76-2 at Pg. ID 1422.) That first page – which McBride allegedly withheld from Wong – provided, among other things, that:

> I, Jenny Wong, Occupational License No. 504634, hereby voluntarily surrender my Occupational License to the Michigan Gaming Control Board in lieu of having my suitability for licensure considered by the Michigan Gaming Control Board.  I fully understand the surrender of my Occupational License will constitute the complete

5

termination of that license and I will retain no rights, entitlements or interests in a Michigan Gaming Board Occupational License, whatsoever. I further understand that if I had chosen not to surrender and terminate my Occupational License I could have availed myself of the right to have the Michigan Gaming Control Board consider my suitability for licensure, and, upon a denial or revocation of my license, I would have been entitled to the hearings and appellate rights provided for the in the [Gaming Act], its Rules promulgated thereunder, and the Administrative Procedure Act.

I further understand that I am agreeing to voluntarily waive any rights to appeal my decision to any court or otherwise.

(ECF #73-14 at Pg. ID 927.)

The second page – the page that McBride presented to Wong and directed her to sign – stated that "along with submitting this surrender and termination of [her] license, [Wong was] also withdrawing [her] pending request for renewal of [her] license." (*Id.* at Pg. ID 928.) The second page also contained a signature block. (*See id.*)

Shortly after McBride yelled at Wong and physically grabbed her badge out of her hand, Wong capitulated to McBride's demand and signed her name in the signature block. (*See* Wong Dep. at 36, ECF #76-2 at Pg. ID 1420.) She signed because she was "forced" to do so. (*Id.* at 131-32, ECF #76-2 at Pg. ID 1515-16.) Wong now says that she did not "know what [she] was signing" because McBride withheld the first page of the document from her. (*Id.* at 37, ECF #76-2 at Pg. ID

1421.)  She claims that she did not intend to give up her license. (*See id.* at 36-38, ECF #76-2 at 1420-22.)

The Casino believed that Wong had surrendered her license by signing the Voluntary Surrender Form, and it thereafter terminated her employment on the ground that she no longer maintained a license to be a casino dealer. (*See* Thomas Dep. at 30, ECF #73-9 at Pg. ID 861; *see also* Disciplinary Notice, ECF #81-3.)

As of the date of this Opinion and Order, Wong has not been formally charged or prosecuted for the alleged theft.

## II

On March 3, 2016, Wong and her husband, Michael Chung ("Chung"), filed this action against McBride, Detroit Entertainment LLC (which does business as the Casino), Thomas, and MSP officers Keating and Hlinka.[2] (*See* Compl., ECF #1; Sec. Am. Compl., ECF #55.)   Wong and Chung have brought the following claims against the Defendants:

- In Count I, brought under 42 U.S.C. § 1983 ("Section 1983"), Wong alleges that she "had a protected property right in her [gaming] license" and that the Defendants denied her "procedural due process" when they "forc[ed]" her "by coercion and duress" to surrender the license, which

_____

[2] McBride passed away while the Motions were pending.  On October 14, 2016, the Court entered a stipulated order substituting McBride's estate as a defendant in this action. (*See* ECF #98.)

7

led to the termination of her employment. (Sec. Am. Compl. at ¶¶ 62-65, ECF #55 at Pg. ID 440);

- In Count II, Wong asserts that the Defendants conspired "to divest [her] of her [gaming] license." (*Id.* at ¶67, ECF #55 at Pg. ID 440-441);

- In Count III, Wong claims that the Defendants falsely arrested her in violation of both Michigan and federal law. (*See id.* at ¶¶ 69-77, ECF #55 at Pg. ID 441-42);

- In Count IV[3], Wong alleges that the Defendants intentionally inflicted "severe and serious emotional distress" upon her. (*Id.* at ¶¶ 87-92, ECF #55 at Pg. ID 444-45); and finally

- In Count V, Chung brings a claim against the Defendants for lack of consortium. (*See id.* at ¶92, ECF #55 at Pg. ID 445.)

The Defendants filed the Motions on June 20, 2016. (*See* ECF ## 73, 76, 77.) The Court held a hearing on the Motions on October 14, 2016. At the conclusion of the hearing, the Court ordered the parties to submit supplemental briefs. (*See* ECF ## 99, 100, 101, 102.) In McBride's supplemental brief, he argued that Wong's due process claim failed because she did not present any evidence that her post-deprivation remedies were inadequate. (*See* McBride Supp. Br. at 8, ECF #102 at Pg. ID 2419.) This argument rests on the so-called "*Parratt* doctrine" that emerged

---

[3] The Second Amended Complaint contains two counts identified as "Count IV." Wong has withdrawn her claims for malicious prosecution that are included in the first Count IV of the Second Amended Complaint.

8

from the decision of the United States Supreme Court in *Parratt v. Taylor*, 451 U.S. 527 (1981).

After it reviewed the supplemental briefs, the Court decided that Wong should be given an opportunity to respond to McBride's *Parratt* doctrine argument. Accordingly, the Court entered a written order requiring the parties to appear for a continued hearing on January 13, 2017,[4] and instructing Wong's counsel to "be prepared to discuss the impact of the Supreme Court case of *Parratt v. Taylor*, 451 US 527 and its progeny, including *Jefferson v. Jefferson County Public School System*, 360 F.3d 583 (6th Cir. 2004) and *Mitchell v. Fankhauser*, 375 F.3d 477 (6th Cir. 2004), on Plaintiff's procedural due process claim." (ECF #103 at Pg. ID 2424.)

### III

In the Motions, the Defendants seek summary judgment. A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on

---

[4] The continued hearing was later adjourned until February 2, 2017.

which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. Indeed, "[c]redibility determinations, the weighing of the evidence and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

## IV

In Count I of the Second Amended Complaint, Wong alleges that the Defendants deprived her of her occupational gaming license without due process of law. The Defendants are entitled to summary judgment on that claim for three reasons. First, Wong has not identified any evidence that Defendants Thomas, Keating, or Hlinka took her gaming license or acted in concert with McBride to deprive her of that license, and thus the claim fails as to those Defendants. Second, Wong has failed to establish that the Casino and Thomas, two private actors, acted under the color of state law such that they may be liable for violating Wong's due process rights, and thus those two Defendants are entitled to summary judgment on this additional ground. Finally, Wong's due process claim fails as to Defendant McBride under the *Parratt* doctrine because Wong has failed to show that her state law remedies for McBride's alleged misconduct were inadequate. Therefore, all of

the Defendants are entitled to summary judgment on Count I of the Second Amended

Complaint.[5]

## A

Wong seeks to hold the individual Defendants liable under Section 1983 for

depriving her of her occupational gaming license without due process of law.  In

order to prevail on this claim, Wong must show that that each of the individual

defendants was "personally involved" in the deprivation of her due process rights.

*See*, *e.g.*, *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (recognizing general

---

[5] In order to assert a procedural due process claim, a plaintiff must have a protected property interest. *See*, *e.g.*, *Daily Services, LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (reciting requirement that "[t]o establish a procedural due process claim" a plaintiff must show, among other things, that she had "a property interest protected by the Due Process Clause").  A license holder has a protected interest in her license if the license may revoked for cause. *See, e.g., Barry v. Barchi*, 443 U.S. 55, 64 n. 11 (1979) (holding that license holder had protected property interest because state law "has engendered a clear expectation of continued enjoyment of [his] license absent proof of culpable conduct…").  There is some question as to whether Wong had a protected interest in her gaming license.  Property interests are generally created by state law. *See*, *e.g.*, *TriHealth, Inc. v. Board of Commissioners*, 430 F.3d 783, 792 (6th Cir. 2005) ("Property rights are created and defined not by the Constitution, but by independent sources such as state law").  Here, the Gaming Act provides that an occupational license like Wong's "is a revocable privilege granted by the state and is not a property right.  Granting a license under this act does not create or vest any right, title, franchise, or other property interest." M.C.L. § 432.208c(1). However, at least three of the Defendants have taken the position that notwithstanding this statutory language, Wong did have a property right in her occupational license because, in their view, the Gaming Act allows revocation of that license only for cause. (*See* McBride Supp. Br. at 2, ECF #102 at Pg. ID 2413; Thomas and Casino Supp. Br. at 4-5, ECF #99 at Pg. ID 2392-93.)  For the purposes of this Opinion and Order, the Court assumes without deciding that Wong had a protected property interest in her license.

rule that in a Section 1983 action, a plaintiff must show that each defendant was "personally involved" in the alleged constitutional violation); *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in the individual capacities under [Section] 1983 can be held liable based only on their own unconstitutional behavior").   Here, Wong has failed to present evidence that Defendants Thomas, Keating, Hlinka were personally involved in the deprivation of her license.

According to Wong, McBride took her license – by first "grabb[ing]" her badge and then forcing and tricking her into signing the second page of the Voluntary Surrender Form.  There is no evidence that any other Defendant knew that McBride intended to do so, played any role in McBride's "grabbing" of Wong's badge, or assisted McBride in compelling Wong to sign the second page of the Voluntary Surrender Form.  In fact, the testimony of the other individual Defendants makes clear that they did not deprive Wong of her license.  For example, Thomas testified that she was not present when McBride allegedly "grabbed" Wong's badge and had her sign the second page of the Voluntary Surrender Form, had not previously communicated with McBride about Wong or her license, and has never even seen the Voluntary Surrender Form. (*See* Thomas Dep. at 42-44, ECF #73-9 at Pg. ID 864.)   MSP officer Keating likewise testified that he has "nothing to do with licensing," he had not spoken with McBride or anybody else about having Wong

12

surrender her license, and he only overheard – and was not physically present during – McBride's interaction with Wong. (Keating Dep. at 40-41, 49, 57-58, ECF #73-7 at Pg. ID 812, 814, 816-17.)  And while MSP officer Hlinka personally witnessed Wong sign the second page of the Voluntary Surrender Form, he testified that he never spoke with McBride about Wong's license and had no involvement the taking of Wong's license. (*See* Hlinka Dep. at 32-33, 39-40, ECF #73-8 at Pg. ID 839, 841.) Wong has not identified any evidence that contradicts this sworn testimony. Accordingly, Defendants Thomas, Keating, and Hlinka are entitled to summary judgment on Wong's claim that they deprived her of her procedural due process rights with respect to the taking of her license.[6]

## B

Wong's procedural due process claim fails as to the Casino and Defendant Thomas for a second reason: Wong has not established that they were acting under the color of state law.  "It is undisputed that … Fourteenth Amendment protections, codified in [Section] 1983, are triggered only in the presence of state action and that a private entity acting on its own cannot deprive a citizen of [her constitutional] rights." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). "A private

---

[6] In addition, as further described below, Wong has failed to present evidence sufficient to create a material factual dispute as to whether the other individual Defendants conspired with McBride to deprive Wong of her license. (*See infra* at Section IV(B).)

entity can [only] be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state." *Id.* Here, Wong argues that the actions of the Casino and its employee Thomas are attributable to the state because they "became the investigative arm of the Michigan State Police" when they conducted their own, internal investigation into the missing poker chip and shared the results of that investigation with the MSP. (*See* Wong Resp. Br. at 19-20, ECF #81 at Pg. ID 2187-88.) But Wong has not cited any authority for the proposition that a private entity becomes a *de facto* "arm" of the state when it conducts its own internal investigation and shares the results of that investigation with state officials. And, as explained below, Wong has failed to present sufficient evidence to create as factual dispute as to whether the Casino and Thomas acted in concert with any of the other state-employed Defendants. (*See infra* at Section IV(B).) Wong has therefore failed to establish that the Casino or Defendant Thomas were acting under the color of state law, and her procedural due process claim fails against them for this second and independent reason.[7]

---

[7] Moreover, even if Wong could establish that the Casino was a state actor – and for all the reasons stated above, she cannot – her procedural due process claim against the Casino would still fail. Wong has not presented any evidence that the Casino, itself, deprived her of her license. Instead, she seeks to hold the Casino liable for Defendant Thomas' alleged violation of her due process rights. However, it is well-established that an entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 693 (1978). Instead, a plaintiff must show that an official policy or custom of the entity led to or caused her constitutional rights to be violated. *See Doe*

## C

Wong's procedural due process claim against McBride fails under the *Parratt* doctrine.

## 1

"To establish a procedural due process claim, a plaintiff must show that (1) [she] had a life, liberty, or property interest protected by the Due Process Clause; (2) [she] was deprived of that protected interest; and (3) the state did not afford [her] adequate procedural rights." *Daily Services, LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014). The Sixth Circuit "place[s] procedural due process [claims] into two categories: those involving a direct challenge to an established state procedure and those challenging random and unauthorized acts." *Id.* at 907 (internal punctuation and citation omitted). Under the *Parratt* doctrine, in order to prevail on the latter type of claim, a plaintiff must "plead and prove" that the state failed to provide a sufficient post-deprivation remedy. *Mitchell*, 375 F.3d at 482. The doctrine authorizes a federal court to "dismiss a procedural due process claim if the state provides an adequate remedy and (1) the deprivation was unpredictable or 'random'; (2) predeprivation process was impossible or impracticable; and (3) the state actor

---

*v. Clairborne Cnty., Tenn. By & Through Clairborn Cnty. Bd. Of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). Wong has not presented any evidence that an official policy or custom of the Casino led to the alleged deprivation of her due process rights.

was not authorized to take the action that deprived the plaintiff of property or liberty." *Daily Services*, 756 F.3d at 907 (internal quotation marks omitted).

## 2

The *Parratt* doctrine applies to Wong's procedural due process claim against McBride.[8]  First, as described by Wong, McBride's conduct was "unpredictable or 'random' from the state's perspective." *Daily Services*, 756 F.3d at 907-8 (explaining that an official's actions are "unpredictable" under the *Parratt* doctrine where the actions are "difficult for the state to predict" and where it is not "foreseeable to the state that its employee[] would not follow state law").  According to Wong, McBride badgered and "scared" her, physically "grabbed" her gaming badge out of her hand, and then "forced" and deceived her into executing the Voluntary Surrender Form. (Wong Dep. at 35-38, 131-32, ECF #76-2 at Pg. ID 1420-22, 1515-16.)  Wong has not identified any evidence suggesting that the state could have or should have predicted that McBride would take her license through such behavior.  Indeed, as described more fully below, the state has carefully circumscribed the authority of the Gaming Board and its employees to take action

---

[8] Where the *Parratt* doctrine applies and the plaintiff fails to satisfy it, both the state and an individual defendant – here McBride – may avoid liability. *See, e.g.*, *Daily Services,* 756 F.3d at 910 (affirming decision granting individual defendants' motion for judgment on the pleadings based on plaintiff's failure to satisfy the *Parratt* doctrine).  Moreover, if the other individual Defendants had been involved in the taking of Wong's license (and, as explained above, they were not), the *Parratt* doctrine would bar Wong's due process claim against them as well.

against licensees, and the state could not reasonably anticipate that McBride would materially deviate from the prescribed procedures in the manner alleged by Wong. Moreover, Wong has not pointed to any evidence that McBride or any other Gaming Board employee engaged in similar alleged misconduct prior to McBride's interaction with Wong. The absence of such evidence underscores that the state had no reason to suspect that McBride would deprive Wong of her license in the manner she alleges. His alleged misconduct was thus unpredictable. *See Daily Services*, 756 F.3d at 908.

Second, predeprivation process was impracticable under Wong's version of events. Wong contends that McBride's efforts to deprive her of her license began the moment McBride encountered her. (*See* Wong Dep. at 35, ECF #76-2 at Pg. ID 1419.) And McBride's encounter with Wong was short; in a manner of minutes he had confused, coerced, and deceived Wong into signing the second page of the Voluntary Surrender Form. (*See id.* at 35-36, ECF #76-2 at Pg. ID 1420.) Under these circumstances, the state could not have provided Wong with predeprivation process. Moreover, Wong has not identified and likely could not "identify any [] practical procedures [the state] could implement to thwart" McBride's intentional disregard of the Gaming Act's requirements for taking action against licenses (described below). *See Daily Services*, 756 F.3d at 909 (concluding that it would be "impractical" to implement "[a]dditional procedures to protect" against the

17

possibility that state employees would intentionally "disregard the predeprivation safeguards already in place").

Third, McBride was not "authorized" to take Wong's license because he "did not have the power or authority to effect [that] deprivation…." *Id.* at 907 (internal quotation marks omitted).   The Gaming Board's administrative rules carefully delineate and limit (1) who has the power to take action against a licensee and (2) under what circumstances such action may be taken, *see* Mich Admin. Code R 432.11101, 432.11103, and those rules do not empower individual Gaming Board employees like McBride to take an occupational license without prior Board authorization. *See Daily Services*, 756 F.3d at 909-10 (holding that actions of state officials were unauthorized where the state "circumscribed" the powers of those officials through "detailed … administrative requirements" and where officials acted beyond those limited powers).

Specifically, the administrative rules provide that "[i]f the [Gaming Board] becomes aware of facts sufficient to support … a disciplinary action against …a licensee under the [Gaming Act] or [its implementing regulations]," then it must file a written complaint that "state[s] in detail the reasons" for the proposed discipline. Mich. Admin. Code R 432.11103(1), (3)(d).  The Gaming Board must then "appoint a board member or an administrative hearing officer to conduct a hearing" on the allegations in the compliant. Mich. Admin. Code R 432.1101(3).  The hearing "shall

be conducted in accordance with [Michigan's] Administrative Procedures Act" and at the hearing the Gaming Board "shall have the affirmative responsibility of establishing, by a preponderance of the evidence, that the [licensee] should be disciplined." Mich. Admin. Code R 432.11106(1).  In addition, at such a hearing, the licensee is entitled to "present an opening statement," "call witnesses" to provide testimony "under oath," "move for a directed finding," and "present a closing argument." Mich. Admin. Code R 432.11106(4), (6), (11).  Only after all of these procedures are followed may the Gaming Board revoke a license. *See* Mich. Admin. Code R 432.11106; 432.11108.

One administrative rule narrowly allows the temporary revocation of a gaming license without the procedural protections applied above, but the rule does not apply here.  Rule 432.11109(1) allows the Gaming Board to suspend a license "without notice or hearing if the board determines that … the action is necessary for the immediate preservation of the integrity of casino gaming, public peace, health, safety, morals, good order, or general welfare." Mich. Admin. Code R 432.11109(1). Where "the board determines that [such] an emergency exists," an "authorized individual" may "suspend … an occupational license." Mich. Admin. Code R 432.11109(2)(a).  Here, the Gaming Board did not determine that an emergency existed, and thus McBride had no authority to take action against Wong's license outside of the process required by the rules.

In sum, no provision of the rules (nor any provision of Michigan law) empowered McBride to take any action against Wong's license on his own without prior authorization from the Gaming Board and without affording Wong the procedural protections described above. Thus, his taking of Wong's license (in the manner she alleges) was unauthorized.

**3**

All three requirements for application of the *Parratt* doctrine are satisfied here: the deprivation accomplished by McBride was both unpredictable and unauthorized, and the state could not reasonably have provided predeprivation process to Wong. Accordingly, in order to avoid summary judgment on her procedural due process claim, Wong must present evidence that the state remedies available to her were inadequate. *See, e.g. Fox v. Van Oosterum,* 176 F.3d 342, 348 (6th Cir. 1999) (affirming summary judgment entered pursuant to *Parratt* doctrine because plaintiff did not "present[] any evidence that his postdeprivation remedies were inadequate."). She has failed to do so.

Several provisions of the Gaming Act and its implementing rules appear to provide remedies to licensees in Wong's position. The Gaming Act allows a party whose license was "revok[ed]" to "request a hearing before the [Gaming] [B]oard."

20

M.C.L. § 432.204(17)(b).[9]  And the Gaming Act's administrative rules provide that "proceedings related to seizures, forfeitures, and disciplinary proceedings shall be conducted in accordance with" Michigan's Administrative Procedures Act, M.C.L. § 24.201 *et seq.* (the "APA"). Mich. Admin. Code R 432.11106(1).  The APA, in turn, authorizes the Board to issue "final decision[s]" on "contested" matters. M.C.L. § 24.285.  Finally, the Gaming Act permits a licensee aggrieved by a decision of the Gaming Board revoking a license to appeal to the state "circuit court." M.C.L. § 432.217.

Wong has not presented any evidence that these procedures and remedies would be inadequate for a licensee whose license was improperly taken by a Gaming Board employee.  Indeed, Wong seems to acknowledge the *adequacy* of these remedies.  She contends that the administrative appeal process described above, if pursued in this case, would have resulted in "a decision that [she] should retain her occupational license." (Sec. Am. Compl. at ¶60, ECF #55 at Pg. ID 439.)

Wong's theory of inadequacy is that these generally-adequate remedies were unavailable to her, but that contention is not supported by any evidence.  More specifically, Wong alleges that when McBride forced and tricked her into signing

---

[9]  Wong alleges that McBride "forced" her "by coercion and duress" to "involuntar[ily]" surrender her license. (Sec. Am. Comp. at ¶¶57, 63, ECF #55 at Pg. ID 439-440.)  Compelling a licensee to *involuntarily* surrender a license is tantamount to revoking the license.

the Voluntary Surrender Form – which included an appeal waiver – he "denied [her] the right to … file an administrative appeal as to her occupational license…." (*Id.*) However, Wong has not cited any *evidence* that the Gaming Board would have declined to hear an appeal challenging the validity of the Voluntary Surrender Form – as she does in this action – on the ground that it was obtained through coercion and deception.  Nor has she cited any case law, statute, or rule that supports the proposition that she lacked the ability "to file an administrative appeal" attacking the validity of the Voluntary Surrender Form.  Moreover, Wong has not presented any evidence that she actually believed that she had given up her right to "file an administrative appeal" to the Gaming Board by signing the Voluntary Surrender Form.  On the contrary, Wong believes that she *did* file such an appeal. (Wong Dep. at 82-83, ECF #76-2 at Pg. ID 1466-67.)  Thus, Wong cannot contend that her administrative remedies were rendered illusory because she was induced to believe that those remedies were unavailable to her.[10]  Simply put, on the record now before the Court, there is no evidence that Wong lacked the ability to file an administrative

---

[10] At the hearing before the Court on February 2, 2017, Wong's attorney said that she made a mistake when she testified under oath that she filed an appeal with the Gaming Board.  However, the Court cannot simply disregard sworn testimony based upon an attorney's assertion that it was given in error.  In any event, the analysis in the accompanying text above does not depend on the accuracy of Wong's testimony that she, in fact, filed an appeal with the Gaming Board.  The Court cites Wong's testimony to underscore that this record cannot support a finding that Wong believed she could not file an appeal to the Gaming Board.

appeal challenging the validity of the Voluntary Surrender Form and McBride's alleged taking of her license. Accordingly (and for the reasons explained above), McBride is entitled to summary judgment on Wong's procedural due process claim.

## V

In Count II of the Second Amended Complaint, Wong alleges that the Defendants conspired to "divest [her] of her [gaming] license" and deprive her of her "right to [] procedural due process." (Sec. Am. Compl. at ¶67, ECF #55 Pg. ID 440-41.) To prevail on that claim, Wong must prove that there was a "single plan, that [each] alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to [her]." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935 943-44 (6th Cir. 1985)).

The individual Defendants have presented evidence negating the existence of the conspiracy alleged by Wong. They all testified that they did not communicate with one another concerning her license and did not act collectively in furtherance of a joint plan to compel her to relinquish her license. (*See*, *e.g.*, Keating Dep. at 47-49, 57, 62, ECF #73-7 Pg. ID 814, 816, 818; Hlinka Dep. at 38-40, ECF #73-8 at Pg. ID 841; Thomas Dep. at 42-44, ECF #73-9 at Pg. ID 864; McBride Dep. at 37-38, ECF #73-11 at Pg. ID 900-01.) Wong argues that circumstantial evidence in the record materially contradicts the Defendants' denial of a conspiracy and creates a

material factual dispute precluding summary judgment on her conspiracy claim. The Court disagrees. As explained below, Wong's evidence is insufficient to create a material factual dispute with respect to her conspiracy claim because it "is just as consistent with independent conduct as it is with conspiracy." *Hensley*, 693 F.3d at 695 (affirming summary judgment on conspiracy claim); *see also Re/Max Int'l, Inc. v. Reality One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) ("[C]ircumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct").

In an attempt to establish the alleged conspiracy, Wong relies heavily on the chronology of events. (*See*, *e.g.*, Wong Resp. Br. at 10-12, ECF #82 at Pg. ID 2221-23.) Wong highlights that after she was arrested, she was quickly forced to sign the Voluntarily Surrender Form and then promptly fired. She insists that "[t]he entire scenario is just too slick in terms of time to be anything other than an engineered process." (*Id.* at 11, ECF #82 at Pg. ID 2222.) But there is an obvious – and equally plausible – alternative explanation for the sequence of events. The nexus between Wong's arrest and interaction with McBride concerning the surrender of her license is easily explained by physical proximity. Wong was arrested in the MSP office, and that office is located *within* the Gaming Board's offices at the Casino. (*See* Keating Dep. at 8-9, ECF #73-7 at Pg. ID 804.) McBride worked in the Gaming Board's office and was nearby while Keating and Hlinka were interviewing Wong.

24

(*See* McBride Dep. at 16-17, ECF #73-11 at Pg. ID 895.)  It is thus easy to understand how he would have encountered Wong during her interaction with the arresting officers.  And it was the Gaming Board's policy to seek a voluntary surrender from any licensee who had been arrested. (*See id.* at 19-20, ECF #73-11 at Pg. ID 896.) That explains why McBride wanted to speak with Wong as soon as he learned that she had been arrested.  Finally, Wong could work for the Casino if and only if she had a license (*see Thomas* Dep. at 30, ECF #73-9 at Pg. ID 861; *see also* Henry Williams Dep. at 17,  ECF #73-12 at Pg. ID 915), and it thus makes sense that the Casino dismissed Wong immediately upon learning that she had surrendered her license.  Simply put, the sequence of events here proves virtually nothing; at the very most, it is equally consistent with concerted conduct as it is with independent action. It is thus insufficient to create a triable question of fact on Wong's conspiracy claim.

Wong's other evidence of a purported conspiracy is equally unpersuasive.  For example, Wong maintains that the officers conducted "an inept investigation" and then, after arresting and releasing Wong, "never contact[ed] her again." (Wong Resp. Br. at 10, ECF #82 at Pg. ID 2221.)  Wong says that the officers' failure to follow-up after her arrest shows that "the intent was that for the arrest to be used for another purpose," i.e., to force Wong to surrender her gaming license. (*Id.*)  But Wong points to no evidence that the arresting officers had any idea that anybody was contemplating taking any action against her license.  Likewise, Wong says that the

McBride knew he could "use [her] arrest as a vehicle to coerce [Wong] to involuntarily give up her occupational license so that she could not be employed as a poker dealer." (*Id.*)  But she cites no evidence to support that contention.

Moreover, while Wong repeatedly claims that the Defendants acted together to deprive her of her gaming license, she has failed to answer the most basic question regarding this alleged conspiracy: Why would they do it?  Wong was a fifteen-year employee of the Casino in good standing.  She was seemingly the exact type of employee that the Casino would want to *retain*.  She has not offered any cogent explanation for why the Casino would suddenly want to terminate her employment, much less do so by framing her for stealing a $100 casino chip and then forcing her to voluntarily surrender her gaming license.[11]  Nor has she provided any logical reason why the MSP, the Gaming Board, or its officers and employees, would have any interest in acting against her.

---

[11] At the initial hearing on the Motions, counsel for Wong speculated that the Casino wanted to frame Wong and force her to voluntarily surrender her license so that it could terminate her employment without providing Wong any of the termination rights she may be have been eligible to receive as a union employee.  But Wong has not identified any evidence that the Casino had any concerns about Wong's union rights, and even if it did, that does not answer the ultimate question of why the Casino would want to fire Wong in the first place given that she was a longtime employee in good standing when the Casino fired her.

In the end, Wong has not identified any evidence that materially contradicts the Defendants' sworn testimony that they did not conspire against her. Thus, the Defendants are entitled to summary judgment on her conspiracy claim.

## VI

In Count III of the Second Amended Complaint, Wong claims she was falsely arrested in violation of both state and federal law. It is undisputed that the only Defendants involved in Wong's arrest were MSP officers Keating and Hlinka. Thus, all of the other Defendants are plainly entitled to summary judgment on Wong's false arrest claims. Keating and Hlinka are likewise entitled to summary judgment on those claims for the reasons described below.

## A

Keating and Hlinka move for summary judgment on Wong's federal false arrest claim on the basis of qualified immunity. "[A]rresting agent[s]" like Keating and Hlinka are "entitled to qualified immunity if [they] could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent[s]." *Everson v. Leis*, 556 F.3d 484, 498-99 (6th Cir 2009). Here, Keating and Hlinka could reasonably have believed that Wong had stolen the missing $100 casino chip and that they thus had the lawful authority to arrest her.

Keating and Hlinka arrested Wong after reviewing the full thirty-minute video of Wong's shift at the poker table on May 13, and Wong's acts on that video are sufficient to give rise to a reasonable belief that she stole the chip. The video reflects the following. Wong tapped into the poker table at about 3:00 p.m. She was wearing a long sleeve shirt or blouse, but she positioned her sleeves so that they were not the same length. She had her right sleeve rolled up and her left sleeve rolled down. At approximately 3:11 p.m., Wong placed her left arm over the chip rack and began sorting different denominations of chips with her right hand. While still manipulating the chips with her right hand, Wong moved her right arm and hand towards her left sleeve (the sleeve that was rolled down). Wong's right hand then appeared to make contact with her left sleeve while making a motion that could be reasonably viewed as placing a casino chip up that sleeve. This is the only time during the thirty-minute shift that Wong brought her right hand into the vicinity of her rolled-down left sleeve, and thus it is reasonable to conclude that this motion is not a normal part of her dealing routine. In short, the video depicts a single, irregular movement by Wong that is consistent with concealing a chip inside her sleeve. Based upon that depiction, Keating and Hlinka could have reasonably (even if mistakenly) believed that Wong stole the chip, and they are thus entitled to qualified immunity on Wong's federal false arrest claim.

In arguing against qualified immunity, Wong asserts that the Court must ask itself: "Could reasonable minds differ as to whether the video [of Wong's shift at the poker table] shows that there is probable cause [] to conclude that [Wong] stole [the] $100 chip on May 13, 2014?  Phrased another way, this Court must find that the video is so conclusive as to the issue of probable cause, that the Defendant is entitled to summary judgment as a matter of law." (Wong Resp. Br. at 14, ECF #80 at Pg. ID 2125.)  Wong then insists that Keating and Hlinka are not entitled to qualified immunity because the video does not conclusively establish that Wong stole the chip. (*See id.* at 14-15, ECF #80 at Pg. ID 2125-26.)

Wong is correct that the video does not conclusively prove that she stole the chip, but she is wrong when she suggests that Keating and Hlinka must demonstrate such conclusiveness to prevail on their qualified immunity defense.  As set forth above, an officer is entitled to qualified immunity form a federal false arrest claim if a reasonable officer could have concluded that there was probable cause to arrest Wong. *See*, *e.g.*, *Pouillon v. City of Owosso,* 206 F.3d 711, 718 (6th Cir. 2000) (explaining that "ultimate question" with respect to a defense of qualified immunity is: "could any reasonable officer have believed that [the actions in question] did not violate [the plaintiff's rights?").  Here, as described above, a reasonable officer could have concluded that the video does depict Wong stealing the chip.  And that is

enough to require the entry of summary judgment in favor of Keating and Hlinka on their qualified immunity defense to Wong's federal false arrest claim.

**B**

Keating and Hlinka move for summary judgment on Wong's state-law false arrest claim on the basis of governmental immunity.  "To qualify for governmental immunity under Michigan state law for intentional torts … a governmental employee must establish that: (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed he was acting, within the scope of his authority, (2) the employee undertook the challenged acts in good faith or without malice, and (3) the acts were discretionary, rather than ministerial, in nature." *Binay v. Bettendorf*, 601 F.3d 640, 653 (6th Cir. 2010) (citing *Odom v. Wayne County,* 760 N.W.2d 217, 228 (Mich. 2008)).

This immunity "'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.' *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (quoting *Odom*, 760 N.W.2d at 225, 228); *see also Buchanan v. Metz*, 647 Fed. App'x 659, 667 (6th Cir. 2016) (applying standard to plaintiff's false arrest claim under Michigan law). Such a "malicious intent is defined as 'conduct or a failure to act that was intended to harm the plaintiff...[or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result.'" *Brown*, 779 F.3d at (quoting

*Odom*, 760 N.W.2d at 228).  In the context of an arrest, "[a] police officer would be entitled to [governmental] immunity under [Michigan law] if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken." *Odom*, 760 N.W.2d at 229.

Defendants Keating and Hlinka have introduced sufficient evidence to satisfy their initial burden to establish they are entitled to governmental immunity.  They both testified at their depositions that they honestly believed they had probable cause to arrest Wong based on their review of the video of her shift. (*See*, *e.g.*, Keating Dep. at 19-20, ECF #73-7 at Pg. ID 807; Hlinka Dep. at 12, ECF #73-8 at Pg. ID 834.)[12]

Wong has not produced sufficient contradictory evidence to create a material factual dispute as to whether Keating and Hlinka acted with a malicious intent when they arrested her.  For example, she points out that the officers did not let her speak to her union representative during her interview and threatened to take her to jail if she did not answer their questions (*see* Wong Dep. at 31-33, ECF #76-2 at Pg. ID 1415-17), but even assuming those allegations are true, they say nothing about whether the officers had malicious intent when they decided to arrest Wong.  Wong

---

[12] The only element of the state-law immunity defense in dispute in this case is whether Keating and Hlinka acted in good faith and/or without malice.  It is undisputed that they were acting in the course of their employment and that their acts were discretionary.

also highlights that she was never prosecuted (nor even contacted again after her arrest), and she argues that the lack of a prosecution is evidence that the officers knew they had no basis to arrest her. (*See* Wong Resp. Br. at 21, ECF #80 Pg. ID 2133.)  But the post-arrest decision by the prosecuting attorney not to prosecute is not evidence that Keating and Hlinka acted with malice or in bad faith when they arrested Wong.[13]  Because Wong has failed to create a material factual dispute as to whether Officers Keating and Hlinka acted in good faith and without malice (as they claim), they are entitled to governmental immunity with respect to Wong's state-law claim for false arrest.

## VII

In Count IV of her Second Amended Complaint, Wong claims that the Defendants intentionally inflicted severe emotional distress upon her.  "Under Michigan law, the elements of a claim of intentional infliction of emotional distress are (1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 442 (6th Cir. 2005).  "In ruling on such a claim, it is initially for the trial court

---

[13] The standards for arrest and conviction at trial are, of course, materially different. As noted above, an arrest is lawful if supported by probable cause.  In sharp contrast, a conviction must be supported by proof beyond a reasonable doubt.  Seen in this context, a prosecutor's decision not to file charges and to decline to proceed to trial does not necessarily say anything about whether the arresting officers acted with probable cause.

to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Id.* (internal punctuation omitted).

Wong has not shown that the Defendants' conduct could reasonably be regarded as sufficiently extreme or outrageous so as to create liability for the intentional infliction of emotion distress. "Extreme or outrageous conduct is that which goes beyond the bounds of decency and would be considered atrocious and utterly intolerable in civilized society." *Id.* at 443. None of the actions Wong complains about come close to meeting this standard. Nor has Wong cited any case in which a court has found a defendant liable for intentional infliction of emotional distress under Michigan law (or the law of any other state) on facts like those present here. Defendants are therefore entitled to summary judgment on Wong's state-law intentional infliction of emotional distress claim.

## VIII

The final claim in the Second Amended Complaint – the claim of Wong's husband for loss of consortium – is derivative of Wong's other claims. Because Wong cannot proceed with her procedural due process, conspiracy, false arrest, or intentional infliction of emotional distress claims against the Defendants, her husband's derivative loss of consortium claim must fail as well.

33

# IX

For the reasons stated above, **IT IS HEREBY ORDERED** that the Motions

(ECF ## 73, 76, 77) are **GRANTED**.


                                    s/Matthew F. Leitman
                                    MATTHEW F. LEITMAN
Dated:  February 13, 2017           UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 13, 2017, by electronic means and/or ordinary mail.

                                    s/Holly A. Monda
                                    Case Manager
                                    (313) 234-5113